# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

---

Henry O'Hara,
     Petitioner


vs                            Case No. 1:03cv52
                                (Dlott, J.; Hogan, M.J.)


Ernie Moore,[1]
     Respondent

---

# REPORT AND RECOMMENDATION

---

Petitioner, a prisoner in state custody at the Lebanon Correctional Institution in Lebanon, Ohio, has filed this action pro se for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the petition, respondent's return of writ and petitioner's "traverse" in reply to the return of writ, as well as the transcript of the challenged state criminal proceedings and certain other documents that this Court has allowed petitioner to include as part of the record under consideration. (*See* Docs. 1, 4, 5, 7, 11, 17, 18, 19, 20).

## Factual And Procedural Background

On January 19, 2000, petitioner was indicted by the Hamilton County, Ohio, grand

---

[1]At the time he filed the instant petition, petitioner properly named as respondent Anthony Brigano, who was then Warden of the Lebanon Correctional Institution (LeCI), where petitioner is incarcerated. However, since the time petitioner instituted this action, Anthony Brigano was replaced by Ernie Moore as LeCI's Warden. Because Ernie Moore is the individual who currently has custody of petitioner, the caption of this case is hereby changed to reflect the proper party respondent. *See* Rule 2, Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254.

jury on one count of rape as defined in Ohio Rev. Code § 2907.02(A)(2) and one count of kidnapping as defined in Ohio Rev. Code § 2905.01(A)(4). (Doc. 4, Ex. A).

Prior to trial, petitioner's counsel filed three separate motions to suppress on March 14, 2000. (*Id.,* Ex. B). In one motion, counsel moved the court to suppress eyewitness identification evidence obtained from an allegedly suggestive photographic array. (*Id.*). In another motion, counsel moved the court to suppress evidence obtained from "the warrantless search of the Defendant's residence." (*Id.*). In the third motion, counsel moved the court to suppress "any statements taken from or made by the Defendant . . . for the reason that same was obtained in violation of Defendant's privilege against self-incrimination and right to counsel, without adequate warning or explanation of his rights." (*Id.*). The first two motions were withdrawn, with petitioner's express agreement, during a pretrial hearing. (Doc. 5, Vol. I, Tr. 22-24). The third motion was withdrawn on the first day of trial, again apparently with petitioner's express consent. (*Id.,* Vol. II, Tr. 27-28).

After a trial before a jury, petitioner was found guilty as charged. (*See* Doc. 4, Ex. C). On April 12, 2000, petitioner was determined to be a "sexual predator" and was sentenced to consecutive terms of imprisonment of ten (10) years for the rape offense and eight (8) years for the kidnapping offense. (*Id.*).

With the assistance of counsel, petitioner filed a direct appeal to the Ohio Court of Appeals, First Appellate District, raising the following assignments of error:

**First Assignment Of Error:** The trial court erred to the prejudice of appellant by overruling appellant's pretrial motion in limine and allowing the State to introduce evidence of appellant's prior criminal conviction in excess of ten years old, and by failing to instruct the jury on the limited use of appellant's prior convictions.

**Second Assignment Of Error:** The trial court erred to the prejudice of appellant by not declaring a mistrial or ordering dismissal of the charges against appellant when the State failed to disclose exculpatory evidence upon defense counsel's Criminal R. 16 request prior to trial, thereby depriving appellant's due process right to a fair trial.

**Third Assignment Of Error:** The trial court erred to the prejudice of appellant when the trial court did not answer a question of law posed by the

jury and by not providing a readback of requested transcript testimony.

**Fourth Assignment Of Error:** The trial court erred to the prejudice of appellant by entering a judgment entry of conviction which was against the manifest weight of the evidence.

**Fifth Assignment Of Error:** Appellant's right to due process of law was prejudiced and he was denied the effective assistance of counsel when trial counsel withdrew motion to suppress appellant's statement and by failing to object to the trial court's failure to answer the jury's question and not providing a readback of requested relevant testimony.

**Sixth Assignment Of Error:** The trial court erred to the prejudice of appellant by sentencing him on both the rape and kidnap[p]ing charges since both charges were allied offenses of similar import to one another.

(*Id.*, Ex. D).

In the "Conclusion" section of the appellate brief, petitioner's counsel noted that petitioner "has requested that his attached *pro se* brief be filed with this Court for consideration as Exhibit A in the Appendix, since it may raise assignments of error not included in appellate counsel's brief." (*Id.,* p. 15). The attached pro se brief contained numerous additional assignments of error. (*See id.,* Appendix). It appears from the record, however, that the Court of Appeals overruled petitioner's motion to proceed with his pro se brief. (Doc. 1, Ex. 16). In so ruling, the court stated "the pro se appellant should submit to his appointed counsel all issues he wishes to have the Court consider, *so that counsel may incorporate them in the brief that is filed by counsel*." (*Id.*) (emphasis added).

On June 29, 2001, the Court of Appeals issued a Judgment Entry and Opinion affirming the trial court's judgment and overruling the six assignments of error presented in the appellate brief filed by petitioner's counsel, as well as two additional assignments of error "challenging the imposition of the maximum sentence on each charge and [petitioner's] adjudication as a sexual predator" that had been asserted by petitioner in his pro se brief. (Doc. 4*,* Ex. F). In its Opinion, the court made findings of fact, which are

3

presumed correct under 28 U.S.C. § 2254(e)(1),[2] regarding the incident that resulted in petitioner's conviction and sentence:

> On December 27, 1999, at approximately 12:45 p.m., Maureen Hicks, while on a lunch break from work, entered a La-Z-Boy Furniture store to drop off some paperwork and a check as part of her job duties.  After leaving the store, she walked over to her vehicle, a Chevrolet Venture minivan, and noticed O'Hara in the front passenger seat of the vehicle parked next to it.
>
> After Hicks seated herself in her van, she waited, expecting O'Hara to leave his vehicle.  O'Hara got out of his car but, instead of moving on, opened the unlocked door of Hicks's van and told her to scoot over.  Hicks testified that O'Hara tried to calm her by telling her he was not going to hurt her and that he only needed a ride.  Hicks further testified that she then told O'Hara, if that was the case, to take the van, not her.  Although Hicks sought to alert others by honking her horn, no one responded.  O'Hara became angry, grabbed her hair, and shoved his way into the van.  According to Hicks, O'Hara was now cursing loudly and reaching into his coat pocket, as if he had a gun, while threatening to "blow her brains out."  O'Hara told Hicks several times not to look at him because he did not want her to see what he looked like.
>
> O'Hara ordered Hicks down on the floor of the van and then drove onto the Cross-County Highway.  Hicks testified that along the way O'Hara told her that he was sorry "that he had to do this," that he was a churchgoing man, and that he was going to let her go.  He denied any intent to rape her. O'Hara eventually stopped the vehicle alongside the highway.  Hicks testified that O'Hara then asked her if she had ever fantasized about having sex with a black man, and more specifically (and more graphically) if she had ever had a black man perform cunnilingus upon her.  In what ensued,

---

[2]28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Petitioner has neither cited nor presented any evidence to rebut the Ohio court's factual findings quoted herein. Therefore, petitioner has not demonstrated by clear and convincing evidence that such findings are erroneous.

4

O'Hara removed Hicks's underclothes and forcibly performed the act upon her.  According to Hicks, O'Hara then remarked upon the size of his penis and asked her if she wanted to have sexual intercourse.  Hicks testified that she replied that she just wanted to be let go.  O'Hara then drove Hicks back to the La-Z-Boy parking lot.

Hicks noticed and remembered the license plate of the car that O'Hara had earlier been sitting in.  She stated that O'Hara told her that he was sorry for what he had done but that "black men aren't like white men," and that once he saw her he had to have her.  According to Hicks, O'Hara also expressed his desire that she not go to the police, and told her that he was going to go home and engage in self-gratification with his unusually large penis while thinking about her.

Hicks testified that, before getting out of the van, O'Hara asked her for twenty dollars because his car needed gas.  She handed him two twenty-dollar bills.  She testified that, to her disbelief, O'Hara then began crying and proclaiming that he was a churchgoing person with a wife and two children, and that he had never done anything similar before.  According to Hicks, O'Hara asked for a kiss, which she refused, and he then got out of the van and allowed her to drive off.

Hicks subsequently drove to a fire station on Springdale Road and requested the receptionist to contact the police.  When the police arrived, she gave a statement, including the license-plate number of the vehicle O'Hara had been using, and was driven to the Hamilton County Sheriff's station on Hamilton Avenue.  Later she was taken to University Hospital for examination.

Police traced the license-plate number Hicks had given them to O'Hara's brother, "T.J."  O'Hara was then arrested on January 10, 1999, positively identified by Hicks, and charged with kidnapping and rape.

O'Hara testified that on December 27, 1999, he and Hicks were far from strangers.  He testified that he had first met Hicks in a Wal-Mart store in either mid-October or early November of that year.  According to O'Hara, although shopping with his then wife, he had struck up a conversation with Hicks and given her his telephone number.  He stated that he received a

telephone call from Hicks about a week later, after he had forgotten about her, in which she suggested that they meet again at the Wal-Mart. According to [O'Hara], their subsequent meeting began an adulterous relationship that involved Hicks coming over to his house for sexual trysts. He stated that Hicks was known by his brothers and by a nephew, Charlie.

O'Hara testified that on the day of the alleged offense he received a telephone call from Hicks asking him to meet her at a K-Mart on Colerain Avenue. He testified that when they met, he got into Hicks's van, as he had done on many prior occasions, and that she then drove them to a bank, where he waited in the van while she went inside. He stated that afterward they drove together to the La-Z-Boy store, where Hicks paid a bill, and that they next drove to his home. He stated that they "began to get intimate," but that he did not perform oral sex upon her. He testified that his brother, "T.J.," who was staying at his house, then interrupted them. According to O'Hara, T.J. was wearing boxer shorts and was exposing himself in an obvious sexually aroused state. He testified that his brother's behavior frightened Hicks, that she wanted to leave, and that she then drove them back to the parking lot at K-mart. He stated that he felt that Hicks was blaming him for bringing her back to his home for a menage a trois with his brother, which had not been the case. He described Hicks as being angry with him, but not too angry to give him a good-bye kiss when he asked for one.

O'Hara stated that he saw Hicks in public after that, and that she refused to talk to him. He stated that he assumed that Hicks's indifference was because of his brother's sexually threatening behavior and her belief that he had somehow attempted to engage her in a menage a trois.

O'Hara's brother was not called as a defense witness. His nephew, Charles, testified that on one occasion he had seen his uncle with a white woman whom he now recognized as Hicks. Both O'Hara and Charles had records of numerous, significant criminal convictions. The detective who arrested O'Hara stated that O'Hara did not know Hicks's last name at the time he was taken into custody, despite his professed intimate relationship with her. (Nor was O'Hara aware of a rose tattoo that Hicks had on her ankle and displayed to the jury in rebuttal.) Contrary to his testimony at trial, O'Hara told the detective that he had had oral sex with Hicks that afternoon, and that

T.J. was not at his house when that had occurred.  O'Hara also told the detective that he did not know why Hicks would have made up the charges against him.  Asked to explain the discrepancies between his statement to the detective and his trial testimony, O'Hara stated that he had only admitted to having oral sex with Hicks because the detective had promised to drop the kidnapping charge if he did so, and that he had lied about T.J. not being at his house because he did not know what T.J. had told the detective in a separate interview.

The jury, choosing not to believe O'Hara's testimony, found him guilty of both kidnapping and rape.

(*Id.,* pp. 2-6).

On August 8, 2001, after the Ohio Court of Appeals issued its decision on direct appeal, petitioner filed a pro se application for reopening of the appeal.  (*Id.,* Ex. W).  In his application, petitioner alleged that his appellate counsel was ineffective for failing to raise the following claims as assignments of error on direct appeal: (1) abuse of discretion by the trial court in refusing a continuance requested by defense counsel; (2) the defense's motion for acquittal should have been granted at the close of all the evidence; (3) abuse of discretion by the trial court in allowing petitioner's taped "involuntary" and "coerced" statement into evidence; (4) the trial court committed prejudicial error "by holding a private conversation with one juror"; (5) abuse of discretion by the trial court in suppressing the defense eyewitness's "in-court identification of the alleged victim"; (6) prosecutorial misconduct based on the State's intentional misrepresentation of the "in-court testimony . . . of [the defense] eyewitnesses"; (7) prosecutorial misconduct based on the State's manufacturing of false evidence against petitioner; (8) prosecutorial misconduct based on the State's intentionally misleading the jury "with untrue statements" about the evidence; (9) the trial court's curative instructions were insufficient; and (10) ineffective assistance of trial counsel.  (*Id.*).  On February 27, 2002, the Ohio Court of Appeals denied petitioner's application for reopening because petitioner's brief exceeded the 10-page limit prescribed by Ohio R. App. P. 26(B)(4) and petitioner had failed to submit with his application "a sworn statement in conformity with App.R. 26(B)(2)(d)." (*Id.,* Ex. Y).  Petitioner sought leave to appeal to the Ohio Supreme Court, which entered an order on June 12, 2002 dismissing the appeal "as not involving any substantial constitutional question."  (*Id.,* Exs. Z, BB).

On September 18, 2001, while his application for reopening was pending before

7

the Ohio Court of Appeals, petitioner attempted to appeal the Ohio Court of Appeals'
direct appeal decision by filing a motion for leave to file a delayed appeal with the Ohio
Supreme Court; the motion was granted on October 24, 2001. (*See id.,* Ex. G).
Proceeding pro se, petitioner filed a memorandum in support of jurisdiction, asserting as
propositions of law the same six claims that were raised in the brief filed by petitioner's
appellate counsel on direct appeal to the Ohio Court of Appeals. (*See id.*, Ex. H). On
January 16, 2002, the Ohio Supreme Court denied petitioner leave to appeal and
dismissed the appeal "as not involving any substantial constitutional question." (*Id.,* Ex.
J).

On April 6, 2001, while his direct appeal was pending before the Ohio Court of
Appeals, petitioner also filed a pro se petition for post-conviction relief with the Hamilton
County Common Pleas Court. (*Id.,* Ex. N). In the petition, petitioner claimed that (1)
there was "newly discovered . . . exculpatory evidence (forensic) held by the Hamilton
County Sheriff's Department Crime Laboratory"; and (2) his trial counsel was ineffective
by failing to subpoena T.J. O'Hara as a defense witness. (*Id.*). On May 23, 2001, the
Common Pleas Court denied the petition on the grounds that petitioner's claims were not
supported by evidentiary documents and such claims were or could have been raised at
trial or on direct appeal and thus were "barred by res judicata." (*Id.,* Ex. P).

Petitioner appealed this decision to the Ohio Court of Appeals, First Appellate
District, claiming that the trial court erred in dismissing the petition on res judicata
grounds, in granting the State's summary judgment motion, and in "failing to file
sufficient findings of facts and conclusions of law in dismissing the [p]etition." (*Id.,* Ex.
Q). On February 27, 2002, the Court of Appeals overruled these assignments of error and
affirmed the trial court's judgment. (*Id.,* Ex. S).

Petitioner next sought leave to appeal to the Ohio Supreme Court, claiming that he
should have been granted an evidentiary hearing on his post-conviction petition. (*Id.,* Ex.
T). On June 12, 2002, the Ohio Supreme Court declined jurisdiction to hear the case and
dismissed the appeal "as not involving any substantial constitutional question." (*Id.,* Ex.
V).

The instant habeas corpus action commenced six months later in January 2003. In
the petition, petitioner asserts nine grounds for relief:

**Ground One:** The evidence at trial was insufficient as a matter of law to
support each element of the offenses beyond a reasonable doubt that the

8

Petitioner now stands convicted of.

**Ground Two:**  Petitioner's conviction was obtained in violation of the 5th, 6th, and 14th Amendment Rights to due process and the confrontational clause when the State f[a]iled to disclose exculpatory evidence, pursuant to the defendant's request for discovery.

**Ground Three:**  Petitioner's conviction was obtained in violation of the 5th, 6th, and 14th Amendment Rights to due process and the confrontation clause when the trial court refused the jury "relevant read-back testimony evidence it **indicated** it would allow the jury to have" (after denying the jury **their request** to take notes).

**Ground Four:**  Petitioner's conviction was obtained in violation of the 5th and 14th Amendment Rights to due process when the trial judge had an admitted private conversation wi[th] **one** particular juror, in the hallway of the courthouse about the petitioner's trial.

**Ground Five:**  Petitioner's right to due process of law was prejudiced and he was denied the effective assistance of counsel when trial counsel withdrew motion to suppress the petitioner's taped statement, and by failing to object to trial court's failure to answer the jury's questions and not providing a read-back of requested **relevant evidence testimony**.

**Ground Six:**  Petitioner's conviction was in violation of his 5th, 6th, and 14th Amendment Right to due process of law and the absolute right of the confrontation clause when the State and the trial court kept the alleged victim sequestered **throughout the petitioner's entire trial proceedings.** And Misrepresenting the defense[']s favorable evidence to the jury.

**Ground Seven:**  Petitioner's conviction was in violation of his 5th, 6th, and 14th Amendment Right to due process of law when the State showed improper exhibits to the jury; and in making closing arguments.

**Ground Eight:**  Petitioner's conviction was in violation of his 5th, 6th, and 14th Amendment Rights when the trial court denied the petitioner his request for a continuance to obtain exculpatory evidence, a material witness, and to guard the petitioner's right to effective representation.

9

**Ground Nine:**  Ineffective assistance of trial counsel.

(Doc. 1, Brief in Support of Petition, pp. 1, 28, 32, 35, 39, 43, 48, 59, 73).

Respondent has not argued, nor does it appear, that this case triggers any statute of limitations concerns.  (*See* Doc. 4, Brief, p. 13).  It further appears that petitioner has exhausted all available state remedies with respect to his claims for relief.  Therefore, the Court will proceed to address each of petitioner's grounds for relief in light of the defenses asserted by respondent in the return of writ (*see id.,* pp. 14-28).


## OPINION

### A. Petitioner Has Waived The Claims Alleged In Grounds Three, Four And Six Through Nine Of The Petition Due To His Procedural Defaults In State Court

In the return of writ, respondent contends that petitioner has waived the claims alleged in Grounds Three, Four and Six through Nine of the petition as a result of his procedural defaults in the state courts.  (Doc. 4, Brief, pp. 14-18).  Specifically, respondent asserts that petitioner committed a procedural default with respect to the claim alleged in Ground Three of the petition when he failed to object at trial to the court's challenged ruling, which resulted in only "plain error" review of the claim by the Ohio courts on direct appeal.  (*Id.,* pp. 15-16).  Respondent further argues that petitioner committed a procedural default when he failed to raise the claims alleged in Grounds Four, Six, Seven, Eight and Nine of the petition on direct appeal, and only asserted them as examples of ineffective assistance of appellate counsel in his application for reopening, which was denied by the Ohio Court of Appeals "based on the motion's [own] procedural deficiencies."  (*Id.*, pp. 16-17).

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must first fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action.  *See* 28 U.S.C. § 2254(b)(1), (c)*; see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971).  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,* 757

F.2d 94, 97, 99-100 (6th Cir.), *cert. denied,* 474 U.S. 831 (1985).

If petitioner fails to fairly present his claims through the requisite levels of state appellate review to the state's highest court or commits some other procedural default relied on to preclude review of the merits of the claims by the state's highest court, and if no avenue of relief remains open or if it would otherwise be futile for petitioner to continue to pursue his claims in the state courts, his claims for habeas corpus relief are subject to dismissal with prejudice on the ground that they are waived. *See O'Sullivan,* 526 U.S. at 847-848; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989). If, because of a procedural default, petitioner has not had his claims considered by the state's highest court and he can no longer present his claims to the state courts, he has waived the claims for purposes of federal habeas corpus review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In this case, as respondent has pointed out, petitioner committed a procedural default when he did not object and indeed consented at trial to a ruling now under attack in Ground Three of the petition, which petitioner contends amounted to an improper denial of the jury's request during deliberations to have certain trial testimony "read back" to it. (*See* Doc. 5, Vol. VI, Tr. 1016-19). Because petitioner did not lodge an objection at trial, the claim was presented to and considered by the Ohio Court of Appeals on direct appeal only in terms of "plain error" under state law. (*See* Doc. 4, Ex. F, pp. 10-11). Specifically, in rejecting this claim, the Ohio Court of Appeals made findings of fact, which are presumed correct, *see supra* p. 4 n.2, and reasoned in relevant part as follows:

> . . . O'Hara argues that the trial court committed plain error when it failed to follow up on a series of questions posed by the jury during deliberations. Among other things, the jury asked whether it could "get" the testimony of one witness and "[w]hat was" the testimony of another. . . . With respect to the requested testimony, the court stated that the testimony was available upon request, but that it would "take some time obviously." The court then advised,

11

So what I would request of you at this point, is this.  You've heard my responses to all the questions.  I would ask you to go back and continue your deliberations if you can, at this point. Write out–as soon as you go back though–if you feel it's appropriate, have the foreperson write out regards to the testimony, what testimony that you want, and at that point I will consider that.

If I feel that's appropriate, I will then ask the court reporter to go retrieve that.  Once she has that altogether, we will bring you back into court at that point.  Interrupt your deliberations, bring you in, give you that material that you've requested, and then proceed from there.  Okay.

Significantly, after making this response to the jury's requests, the trial court asked both the prosecutor and defense counsel if they had any comment upon the record.  Defense counsel replied, "No, your Honor.  I've discussed the questions and answers with Mr. O'Hara, and we have no objection to anything that you've said."

The trial court manifestly did not deny the jury's request for testimony, but only cautioned that such a request would take some time and that the jury should fully consider the request and submit it in writing.  The court told the jury that it should do this as soon as deliberations resumed, which means that the jury was not told that it had to proceed without reviewing the testimony if it felt that such a review was necessary to going forward.  More importantly, defense counsel stated on the record that, after discussion with O'Hara, there was no objection to such a procedure.

In order to find plain error under Crim.R. 52(B), we must determine (1) whether there was error, (2) whether it was plain error, and (3) whether the defendant was prejudiced. . . .  Here, we do not find any error, let alone plain error, nor can we find any basis to conclude that O'Hara was prejudiced in the absence of any further evidence that the jury continued to have an interest in reviewing the testimony.

(*Id.*) (case citation omitted).

It is well-settled that, on federal habeas corpus review, a court may be barred from considering an issue of federal law from a judgment of a state court if the state judgment rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the state court's decision. *Harris,* 489 U.S. at 260-62. The "adequate and independent state ground" doctrine has been applied to state decisions refusing to address the merits of a federal claim because of violations of state procedural rules, including the failure to make a timely objection at trial. *Id.* at 261; *Sykes,* 433 U.S. at 86-87; *see also McBee,* 763 F.2d at 813. Such a procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a judgment in the case "clearly and expressly" states that its judgment rests on the state procedural bar. *Harris,* 489 U.S. at 263. In cases where the last state court to render a reasoned opinion on the claim explicitly relies on a procedural bar, the court will presume that a later unexplained order did not silently disregard the procedural default and consider the merits of the claim. *Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991).

The Ohio Court of Appeals was the last state court to render a reasoned opinion addressing the claim of error asserted in Ground Three of the petition. In presenting his claim on direct appeal, petitioner conceded at the outset that because he had failed to object at trial to the court's "handling of the jury questions," the claim was "waived unless it amounts to plain error." (*See* Doc. 4, Ex. D). By thus confining the court's review to "plain error" under state law, petitioner committed a procedural default to the extent he thereby removed or, in other words, failed to "fairly present" his federal constitutional claim to the state courts. *Cf. McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *cert. denied,* 532 U.S. 958 (2001); *Franklin v. Rose,* 811 F.2d 322, 325 (6th Cir. 1987).

In any event, in rejecting petitioner's claim of plain error, the Ohio Court of Appeals clearly and expressly relied "[s]ignificantly" and "importantly" on the fact that petitioner's counsel stated on the record that after discussion with petitioner, he had no objection to the trial court's procedure for handling the jury's requests for testimony. The court's review solely for plain error based on petitioner's concession that his claim was otherwise "waived" does not constitute a waiver or non-enforcement of the state procedural bar by the reviewing court. *See, e.g., Mason v. Mitchell,* 320 F.3d 604, 635 (6th Cir. 2003); *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir. 2000) (citing *Paprocki v. Foltz,* 869 F.2d 281, 284-85 (6th Cir. 1989)), *cert. denied,* 532 U.S. 989 (2001). Moreover, the Ohio Supreme Court's later unexplained decision, denying petitioner leave to appeal and dismissing the appeal for lack of a substantial constitutional question, must be presumed to rely on the same

procedural default. *See Ylst,* 501 U.S. at 803-04.

Petitioner's procedural default bars consideration of the claim presented in Ground Three of the petition absent a showing of cause and prejudice or that a "fundamental miscarriage of justice" will result if the claim is not considered. Petitioner has not demonstrated that failure to consider this claim will result in a "fundamental miscarriage of justice." Petitioner argues that his trial counsel's ineffectiveness in failing to lodge an objection constitutes "cause" for his procedural default. However, as discussed *infra,* p. 32, petitioner has not demonstrated his counsel's omission amounted to ineffective assistance in this case. In any event, as the Ohio Court of Appeals reasonably found, the trial court did not deny the jury's request for testimony as petitioner contends, but merely told the jury to fully consider its request as soon as deliberations resumed and submit the request in writing if it determined that a review of the testimony was necessary for deliberations to proceed; "in the absence of any further evidence that the jury continued to have an interest in reviewing the testimony," no prejudice can be found.

With respect to petitioner's claims alleged in Grounds Four and Six through Nine of the petition, petitioner committed numerous procedural defaults. First, these claims were not raised as assignments of error in the brief filed on direct appeal by petitioner's appellate counsel. Moreover, to the extent petitioner presented any of these claims to the Ohio Court of Appeals as additional assignments of error in his pro se brief attached as an exhibit to his counsel's appellate brief (*see* Doc. 4, Ex. D, Appendix), petitioner committed a procedural default by failing to reassert such claims on further appeal to the Ohio Supreme Court (*see id.,* Ex. H). *Cf. O'Sullivan,* 526 U.S. at 845, 848; *Leroy,* 757 F.2d at 97, 99-100.

Petitioner also attempted to raise these claims as the underlying bases for the ineffective assistance of appellate counsel claims presented in his application for reopening of his appeal. (*See* Doc. 4, Ex. W). However, as respondent points out in the return of writ (*see id.*, Brief, p. 16), the claims, which were defaulted as independent assignments of error on direct appeal and served "only as the basis for his ineffective-assistance-of-appellate-counsel claim[s]" in the reopening proceedings, remain procedurally barred from review on the merits. *See Lott v. Coyle,* 261 F.3d 594, 611-12 (6th Cir. 2001), *cert. denied,* 534 U.S. 1147 (2002).

In any event, even assuming, *arguendo,* petitioner's underlying claims were fairly presented for review on the merits in his application for reopening, petitioner committed additional procedural defaults by failing to comply with certain procedural rules in the

reopening proceedings, which were clearly and expressly relied on by the Ohio Court of Appeals as grounds for denying petitioner's reopening application (*see* Doc. 4, Ex. Y). *Cf. Harris,* 489 U.S. at 260-62. The Ohio Supreme Court's later unexplained order dismissing petitioner's further appeal "as not involving any substantial constitutional question" (*see* Doc. 4, Ex. BB), must be presumed to rely on the same procedural defaults. *See Ylst,* 501 U.S. at 803-04.

Finally, to the extent any of the claims alleged in Grounds Four and Six through Nine are based on claims asserted by petitioner in his state post-conviction petition, the claims remain procedurally barred under the state-law res judicata ground relied on by the Ohio courts in denying post-conviction relief. (*See* Doc. 4, Exs. P, S, V).

Therefore, in light of petitioner's numerous procedural defaults in the state courts, it appears that the claims alleged in Grounds Four and Six through Nine of the petition are waived unless petitioner can show cause for his defaults and actual prejudice as a result of the alleged errors, or demonstrates that failure to consider the claims will result in a "fundamental miscarriage of justice." *See Coleman,* 501 U.S. at 750; *see also Murray,* 477 U.S. at 485; *Isaac,* 456 U.S. at 129; *Sykes,* 433 U.S. at 87.

Petitioner has suggested in his state reopening application that his appellate counsel's ineffectiveness constitutes "cause" for his procedural default in failing to raise the claims on direct appeal. Ineffective assistance of appellate counsel may constitute cause for a procedural default, *Murray,* 477 U.S. at 488, unless that claim also has been procedurally defaulted, *Edwards v. Carpenter,* 529 U.S. 446, 452 (2000); *Richey v. Mitchell*, 395 F.3d 660, 679 (6th Cir. 2005), *judgment vacated on other grounds,* __ S.Ct. __, 2005 WL 3144332 (U.S. Nov. 28, 2005) (No. 05-101). Here, it appears that petitioner procedurally defaulted his ineffective assistance of appellate counsel claims, asserted as "cause" for his procedural default on direct appeal, because he did not comply with certain procedural requirements in the reopening proceedings, which resulted in the denial of his reopening application. In any event, contrary to petitioner's contention, it appears that petitioner's counsel did attempt to have petitioner's pro se claims considered by the Ohio Court of Appeals by attaching petitioner's pro se brief to his appellate brief. Finally, petitioner cannot rely on this argument to explain his own procedural default stemming from his failure to raise these claims in his pro se memorandum in support of jurisdiction on further appeal to the Ohio Supreme Court.

Petitioner has also suggested through documents that he has sought to include in the record that a "fundamental miscarriage of justice" will occur if his claims are not

15

considered on the merits because he is actually innocent of the rape and kidnapping charges against him. Specifically, petitioner has submitted an affidavit dated June 14, 2001 from his brother, T.J. O'Hara, and an affidavit dated February 28, 2005 from Cynthia M. Figy. O'Hara averred in his affidavit that he was living at his brother's home on December 27, 1999 and that on that date, he "was there when Ms. Maureen Hicks (the alleged victim of rape) willingly came to this residence with my brother (Hen[]ry O'Hara);" that when he entered a "back room of the residence," he saw Hicks "performing oral sex" on petitioner; and that Hicks then "became frightened and upset, and demanded to leave" because of his "intrusion." (Doc. 18, "Sworn Affidavit," ¶¶ 1-3). O'Hara also stated that he had seen Hicks on two other occasions with petitioner at his home, where "the two entered the back room of the house alone." (*Id.,* ¶ 4).

Cynthia Figy, who lives in Minnesota, averred in her affidavit that she received phone calls from Hicks in November and December 1999 about petitioner. (Doc. 19, "Sworn Affidavit of Cynthia M. Figy"). In the November 1999 phone conversation, Hicks wanted to know if petitioner "had come to Minnesota, and was there with" Figy; Hicks explained she had gotten Figy's number from petitioner's pager and that she and petitioner had been "seeing" each other for "the last few months." (*Id.,* ¶ 1). In the December 1999 phone call, Hicks appeared upset and was yelling, telling Figy that she knew petitioner was "there with [Figy]" because he had told her "that he would be leaving town for the holidays, and that he was going to Minnesota and wouldn't be back until after the new year." (*Id.,* ¶ 2). Figy averred that when she informed Hicks that petitioner was not with her, Hicks then gave her her work phone number "and asked me to call her if [petitioner] did show up here." (*Id.,* ¶¶ 2-3). Figy stated that after petitioner's arrest, she "was compelled to call the phone number . . . Hicks had given [her];" Figy also stated that although petitioner's trial counsel initially told her she'd be called to testify as a defense witness at trial, she was later informed that the trial judge would not allow her "'time' to bring me in from out of town." (*Id.,* ¶¶ 3-4).

Under the "fundamental miscarriage of justice" exception to the waiver doctrine, petitioner must demonstrate that the alleged constitutional violations "probably resulted in the conviction of one who is actually innocent" of the crimes charged. *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995); *cf. Souter v. Jones,* 395 F.3d 577, 597-602 (6th Cir. 2005) (upholding equitable tolling of one-year statute of limitations governing habeas petitions "based on a credible claim of actual innocence").

Under this "actual innocence" standard, the otherwise-barred petitioner "must show

it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt" in light of all the evidence, "including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Schlup,* 513 U.S. at 327-28 (citing with approval the standard enunciated by Judge Friendly in a 1970 law review article, *Is Innocence Relevant? Collateral Attack on Criminal Judgments,* 38 U.Chi.L.Rev. 142, 145 (1970)). To be credible, a claim of actual innocence requires petitioner to support his allegations "with new reliable evidence . . . that was not presented at trial" either because it was wrongly excluded or unavailable at the time of trial. *Schlup,* 513 U.S. at 324. Establishing actual innocence requires a showing of factual innocence, not mere legal insufficiency. *See Bousley v. United States,* 523 U.S. 614, 623 (1998); *Hampton v. United States,* 191 F.3d 695, 703 (6th Cir. 1999). In order to pass through the actual innocence gateway, a petitioner's case must be "truly extraordinary." *Schlup,* 513 U.S. at 327.

Here, petitioner's "new" evidence is insufficient to give rise to a credible claim of actual innocence. First, the Court questions whether this evidence was in fact unavailable at the time of petitioner's trial. Petitioner has not provided any explanation as to why his brother, who petitioner has claimed was the only other person who actually witnessed the December 27, 1999 incident that purportedly caused the victim to bring false rape and kidnapping charges against him, was not called or was otherwise unavailable to testify at trial on his behalf. Moreover, although Figy has indicated in her affidavit that the trial court would not grant defense counsel a continuance in order to give her "time" to travel from Minnesota to testify at petitioner's trial, it appears that the lack of "time" was due in large part to petitioner's belated disclosure to his counsel four days before the scheduled trial date that there was "another witness in Minnesota" who "would be very helpful to [the] defense." (*See* Doc. 5, Vol. I, Tr. 35-36).

Second, the Court has doubts about the "reliability" of the information contained in affidavits that were executed over one year after petitioner's conviction by his brother and almost five years after his conviction by a woman who was identified at trial as petitioner's "girlfriend," and who was known by petitioner to be a "very helpful" witness since the time of his trial and, indeed, has been serving petitioner in an "advisory" capacity in the instant proceeding (*see* Doc. 7, p. 44 & Certificate of Service; *see also* Doc. 5, Vol. VI, Tr. 817-18). The Court is particularly skeptical about Figy's affidavit, which relates in great detail the substance of phone conversations between Figy and the victim, including the victim's work telephone number, that allegedly took place over five years earlier in November and December 1999. Although petitioner sought a continuance

17

at trial and has challenged the trial court's denial of his request for a continuance in his pro se brief on direct appeal, his motion for reopening of the appeal, and the instant habeas corpus petition filed in January 2003, he has never alerted the courts about the substance of any testimony by Figy in his favor until February of this year.

Although the passage of time between the incident in question and T.J. O'Hara's affidavit was less lengthy, O'Hara's affidavit is additionally suspect because it contains statements that conflict with statements made by him in a prior letter to petitioner dated March 5, 2001, to the effect that he told petitioner's attorney that when he gave petitioner his car "that girl was with you sitting out in the driveway" and that he had only seen her "once before at [petitioner's] home." (*See* Doc. 4, Ex. N, attachment).  No mention was made in that letter of the events allegedly witnessed at petitioner's home on December 27, 1999.  However, tellingly, O'Hara wrote: "I'll do anything within my power to help your release. . . .  I'm with you money wise and what ever you need me to do until you are free.  I promise!" (*Id.*).  Finally, T.J. O'Hara's affidavit significantly differs from petitioner's version of events to the extent T.J. did not mention any inappropriate sexual behavior on his own part, which according to petitioner is what induced the victim to falsely accuse petitioner of kidnapping and rape.

In light of the victim's compelling contradictory testimony regarding her rape and kidnapping on December 27, 1999 by a stranger, later identified as petitioner, as well as the significant discrepancies between petitioner's own trial testimony and his statements to the police on his arrest, it is highly unlikely that no reasonable juror would have found petitioner guilty beyond a reasonable doubt on the rape and kidnapping charges if the additional testimony contained in the two suspect affidavits had been introduced into evidence at trial.

Accordingly, in sum, because petitioner has neither demonstrated "cause" for his procedural defaults in the state courts nor made a sufficiently credible showing of his "actual innocence" in this case, this Court concludes that petitioner has waived the grounds for relief alleged in Grounds Three, Four, Six, Seven, Eight and Nine of the petition due to his procedural defaults in the state courts.  The claims, therefore, are not subject to review on the merits in this federal habeas corpus proceeding.

## B.  Petitioner Is Not Entitled To Habeas Corpus Relief Based On His Claim Alleged In Ground One Challenging The Sufficiency Of The Evidence

In Ground One of the petition, petitioner claims that insufficient evidence was

presented at trial to support his convictions for kidnapping and rape.  (Doc. 1, Brief in Support of Petition, pp. 1-27; *see also* Doc. 7, pp. 28-43).

As an initial matter, the Court points out that petitioner argued the issue on direct appeal in the state courts only as a "manifest weight of the evidence" claim under standards set forth in the cited Ohio appellate court case, *State v. Otten*, 515 N.E.2d 1009 (Ohio Ct. App. 1986).  (*See* Doc. 4, Ex. D, pp. 10-12; Ex. H, pp. 10-11).  A "manifest weight of evidence" claim, which is based on a state law concept that is "both quantitatively and qualitatively different" from a constitutional due process sufficiency of evidence standard, *see Tibbs v. Florida,* 457 U.S. 31, 41-47 (1982), and *State v. Thompkins,* 678 N.E.2d 541, 546-48 (Ohio 1997), raises an issue of state law only that is not cognizable in a federal habeas corpus proceeding such as this.  *See* 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984).  Because petitioner argued the issue to the Ohio courts only in terms of the state-law "manifest weight of evidence" standard, a strong argument could have been made that petitioner has waived the federal constitutional sufficiency of evidence claim that is alleged in Ground One of the petition. *See McMeans,* 228 F.3d at 681; *Franklin,* 811 F.2d at 325.  However, because respondent has not argued waiver as a defense with respect to this ground for relief, the Court will proceed to address the merits of petitioner's sufficiency of evidence claim.

The Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense.  *In Re Winship,* 397 U.S. 358, 363-64 (1970).  When petitioner raises an insufficiency of evidence claim in a petition for a writ of habeas corpus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original).  The *Jackson* standard must be applied with explicit reference to the criminal offense as defined by state law.  *Scott v. Perini*, 662 F.2d 428, 431 (6th Cir. 1981) (quoting *Jackson*, 443 U.S. at 324 n.16), *cert. denied*, 456 U.S. 909 (1982).  Under this standard, the State is not required to rule out every hypothesis except that of guilt beyond a reasonable doubt.  *Jackson,* 443 U.S. at 326.  Rather, a "federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir.), *cert. denied,* 464 U.S. 951, 962 (1983).  It is the jury's responsibility as the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence.  *Jackson,* 443 U.S. at 319.  Consequently, the reviewing

court is not permitted to make its own subjective determination of guilt or innocence or otherwise substitute its opinion for that of the jury which convicted the petitioner. *Id.* at 318-19 & n.13; *see also York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam), *cert. denied,* 490 U.S. 1049 (1989).

Circumstantial evidence, or proof of certain facts from which the jury may reasonably infer other connected facts, often is presented by the State to establish an element of an offense. *See State v. Gaines,* No. 82301, 2003 WL 22966190, at *10 (Ohio Ct. App. Dec. 18, 2003) (unpublished), *appeal dismissed,* 809 N.E.2d 1158 (Ohio 2004). In assessing the sufficiency of evidence under *Jackson*, circumstantial evidence alone may be sufficient to sustain a conviction. *Dixon v. Miller,* 293 F.3d 74, 81 (2nd Cir.), *cert. denied,* 537 U.S. 955 (2002); *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996); *Jamison v. Collins,* 100 F.Supp.2d 647, 705 (S.D. Ohio 2000), *aff'd,* 291 F.3d 380 (6th Cir. 2002).

In this case, the Ohio Court of Appeals was the only state court to issue a reasoned decision addressing the merits of petitioner's claim, which as discussed above, *see supra* p. 19, was presented and considered only under state-law "manifest weight of the evidence" standards. The court rejected petitioner's claim, reasoning in relevant part as follows:

> . . . O'Hara argues that his conviction was contrary to the weight of the evidence. He argues that Hicks's version of events was simply incredible. For example, he contends that it is absurd to believe that the abduction occurred in broad daylight with no one noticing, despite Hicks honking her horn, and that he would stop the van on a highway to perform cunnilingus. He further derides Hicks's testimony that he drove her back to the same parking lot from which he had abducted her, asked her for money, and requested a good-bye kiss. He also decries the complete lack of corroborating evidence.
>
> ****
>
> Obviously the jury in this case was presented with two vastly different versions of the truth. While O'Hara disparages Hicks's testimony as incredible, it is his version of events that requires the willing suspension of disbelief. To accept O'Hara's version, the jury would have had to accept that Hicks had engaged in an adulterous affair with a stranger who had

20

approached her out of the blue in a Wal-Mart store; that O'Hara had never learned her last name in the course of their entire intimate relationship, or become aware of a distinctive tattoo on her ankle; and that Hicks, outraged at the sexually perverse behavior of O'Hara's brother (who did not testify), had concocted on the drive home from his apartment an elaborate scheme to falsely charge him with rape that would involve the police and eventually expose their illicit relationship to her husband in a court of law. The jury here would have also had to overlook the fact that O'Hara had initially given a different story to the police when he was arrested, claiming that he had had oral sex with Hicks, and that he had not known why she would falsely charge him with rape and kidnapping. In sum, even sitting as a thirteenth juror, we find no basis to disagree with the twelve in this case that the person engaging in an extraordinarily malicious fiction was O'Hara, not Hicks.

(Doc. 4, Ex. F, pp. 12-13).

At trial, the victim Hicks positively identified petitioner as the stranger who on December 27, 1999 abducted her in her van from the La-Z-Boy furniture store parking lot and then raped her by forcibly performing oral sex on her before returning back to where his car was parked in the La-Z-Boy parking lot and allowing her to drive off. (*See* Doc. 5, Vol. III, Tr. 237-59, 264-65). This testimony was sufficient in and of itself to establish petitioner's guilt beyond a reasonable doubt on the kidnapping and rape charges in this case.

Petitioner essentially argues in his "traverse" brief that the trial transcript reveals that Hicks was not a credible witness and, therefore, her testimony about the events of December 27, 1999 cannot be relied on to establish that he committed the kidnapping and rape offenses charged against him. (*See* Doc. 7, pp. 31, 35, 38-42). However, as the Ohio Court of Appeals apparently recognized, petitioner had his own problems in presenting a credible defense, which a reasonable juror could have determined outweighed the relatively minor inconsistencies cited by petitioner regarding the victim's version of events. In any event, unlike this Court, the jurors were in the unique position to see the witnesses as they testified and to evaluate their demeanor. As *Jackson* makes clear, given its unique position, the jury was responsible as the trier of fact to resolve the conflicts in the prosecution and defense witnesses' testimony and to assess the credibility and weight to be accorded such evidence. *See Jackson*, 443 U.S. at 319, 326.

Accordingly, upon viewing the evidence in the light most favorable to the prosecution, this Court concludes that any rational trier of fact could have found beyond a reasonable doubt that petitioner was guilty of kidnapping and raping the victim, Maureen Hicks, on December 27, 1999. Therefore, petitioner is not entitled to habeas corpus relief based on his sufficiency of evidence claim alleged in Ground One of the petition.

## C. Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground Two That The State Improperly Suppressed Evidence In His Favor

In Ground Two of the petition, petitioner alleges that the State violated his constitutional rights when it failed to disclose "exculpatory evidence" in response to the defense's request for discovery. (Doc. 1, Brief in Support of Petition, pp. 28-31; *see also* Doc. 7, pp. 10-19).

In the petition, petitioner has cited numerous items that he claims were improperly withheld by the State. (*See* Doc. 1, Brief in Support of Petition, pp. 28-31). However, as respondent has noted in the return of writ (*see* Doc. 4, Brief, p. 22 n.1), and as discussed *supra,* pp. 14-18, with respect to the claims alleged in Grounds Four and Six through Nine of the petition, petitioner has waived all but one of these specific claims. Although petitioner contends he cited each instance in his pro se brief attached to his counsel's brief on direct appeal to the Ohio Court of Appeals, as respondent has pointed out in the return of writ, he did not mention them in his memorandum in support of jurisdiction on further appeal to the Ohio Supreme Court. Therefore, the Court will only address the sole claim that was raised both by petitioner's counsel on direct appeal and by petitioner in his brief on further appeal to the Ohio Supreme Court to the effect that the State improperly withheld the victim's prior written statement to the Colerain Township police department. (*See* Doc. 4, Ex. D, pp. 5-8; Ex. H, pp. 5-8).

Upon review of the trial transcript, it appears that the prior written statement was first vaguely referred to by the victim during her direct examination at trial. Specifically, the victim mentioned that a Colerain Township police officer "took my statement" before the matter was referred over to the Hamilton County Sheriff's Office, where she was interviewed by Detective John Hinrichs and the criminal investigation ensued. (Doc. 5, Vol. III, Tr. 262; *see also id.,* Vol. V, Tr. 579-80). Before beginning her cross-examination of the victim, defense counsel generally requested that she be provided with "all oral, written, or taped statements of the victim, whether made to law enforcement or to the Grand Jury." (*Id.,* Vol. III, Tr. 282). After the prosecutor stated that he was

22

"unaware of tape recorded statements or written statements" made by the victim that "would fall under potentially a preservation rule," the court denied defense counsel's request for disclosure of statements made to law enforcement, but allowed the parties to review the victim's statements before the grand jury for inconsistencies. (*Id.,* Tr. 283-86).

Later, during her cross-examination, the victim revealed that she had given a "written statement" to the Colerain Township police officer who questioned her immediately after the incident. (*Id.,* Vol. IV, Tr. 443). Defense counsel, however, did not make any request at that time to view the prior written statement for any inconsistencies. After the victim testified, the State called three other witnesses to the stand before calling Detective Hinrichs as its last witness. In response to defense counsel's questioning on cross-examination, Hinrichs testified that he had in his possession a "three page written statement" from the victim, which had been taken by the Colerain Township police officer on the date of the incident. (*Id.,* Vol. V, Tr. 645). Before concluding her cross-examination of Hinrichs, defense counsel requested that she be granted "the opportunity to view th[e] statement that Ms. Hicks first made to the Colerain Township Police Department . . . for prior inconsistent statements," as well as the "opportunity to question not only the Colerain Township police officer about it, but also, Ms. Hicks on recall, if . . . there are those prior inconsistent statements." (*See id.,* Tr. 657-59).

Citing Ohio R. Crim. P. 16(B)(1)(g), the trial court agreed at that point to conduct an *in camera* inspection of the victim's prior written statement for the purpose of determining if any inconsistencies existed between the statement and the victim's trial testimony. (*Id.,* Tr. 661-63). After reading the statement, the court found "absolutely no inconsistencies with her testimony whatsoever." (*Id.,* Tr. 666). Defense counsel contended, however, that there was a "major inconsistency" in that the victim stated to the police officer that the offense occurred at 1:45 p.m., whereas at trial, she indicated that "it happened somewhere around [12:45] to 1:10." (*Id.,* Tr. 667).[3] Although the trial court responded by stating, "I don't think it's a real inconsistency," out of an "abundance of caution," it allowed defense counsel the opportunity to recall the victim to ask her about the "1:45 statement." (*Id.,* Tr. 668, 670). In so ruling, the court cautioned that "other than that, I don't think there is any other inconsistencies, and there is nothing that

---

[3]In arguing this one point, defense counsel expressly acknowledged that "[t]here was nothing else, your Honor, that I saw [in the statement] that I thought was a major inconsistency." (*Id.*, Tr. 667).

I would allow you to ask as far as inconsistency from this particular statement." (*Id.,* Tr. 669).  Although the victim was later recalled by the State as a rebuttal witness (*see id.,* Vol. VI, Tr. 944), defense counsel apparently decided not to exercise the right to recall or otherwise question the victim about the purported "major inconsistency" in her prior written statement to the Colerain Township police.

As the last state court to issue a reasoned decision addressing petitioner's claim stemming from the late disclosure of the victim's prior written statement, the Ohio Court of Appeals made the following findings of fact, which are presumed correct, *see supra* p. 4 n.2, and overruled the assignment of error as follows:

> . . . O'Hara argues that he should have been granted a mistrial because the prosecutor did not disclose upon pretrial discovery Hicks's written statement to the Colerain Township police officers who initially investigated the case.  According to O'Hara, the statement was favorable to the defense because in it Hicks had placed the time of the offense at 1:45 p.m. and had never claimed that O'Hara actually had a gun.
>
> The existence of the written statement was revealed during Hicks's testimony.  Defense counsel, after Hicks had completed her testimony, moved to have the statement examined under Crim.R. 16(B)[(1)](g).  That section provides, upon request of the defendant, for an *in camera* inspection of a witness's statement by the court, with the attorneys participating, to determine the existence of any inconsistencies between the statement and the trial testimony.  The trial court here conducted such an inquiry.  Although the court did not find any inconsistencies, defense counsel felt that the 1:45 p.m. time given to the Colerain police was sufficiently inconsistent with Hicks's earlier testimony to warrant recalling Hicks for further cross-examination.  The court stated that it would allow the defense to recall Hicks for the purpose of questioning her about any perceived discrepancy.  But when Hicks was later recalled by the state as a rebuttal witness on an unrelated matter, defense counsel chose not to question her about the time of the offenses.  And at no time did counsel suggest that there was any inconsistency between Hicks's testimony and her prior statement in which she had never claimed that O'Hara actually possessed a weapon.
>
> Despite the trial court's scrupulous adherence to the procedure set forth in Crim.R. 16(B)[(1)](g), O'Hara now argues that Hicks's statement was

exculpatory information that the prosecution "suppressed" in violation of *Brady v. Maryland* (1963), 373 U.S. 83. . . .  In *Brady,* the United States Supreme Court held that the prosecution violates the defendant's right to due process when it fails to exchange evidence that is both favorable to the defendant and material to guilt or punishment.  *Id.* at 87. . . .  In order for evidence to be deemed material, there must [be] a reasonable probability that, had the state disclosed the evidence, the result of the trial would have been different.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  *United States v. Bagley* (1985), 473 U.S. 667, 682. . . .

The state argues that there were no discrepancies in Hicks's statements, let alone material ones.  The state points out, in this regard, that Hicks merely testified that she had gone to the La-Z-Boy store at 12:30 p.m., and that, taking into account all that had transpired later, she was probably raped at very close to 1:45 p.m.  The state also argues that there was no discrepancy between her testimony that O'Hara had acted as if he had a gun by sticking his hand into his coat pocket, and her earlier statement in which she had made no claim that he actually had a gun.

We agree with the state that whatever slight difference there was between Hicks's testimony and earlier statement was not material, and certainly was not sufficient to undermine confidence in the verdict reached by the jury.  Moreover, we disagree with O'Hara that the prosecution "suppressed" the statement.  The statement was appropriately produced pursuant to the procedure set forth in Crim.R. 16(B)[(1)](g).  Although O'Hara argues that, because the statement was not disclosed prior to trial, he was deprived of the opportunity to effectively cross-examine Hicks, this argument ignores the fact that the trial court expressly granted defense counsel leave to recall Hicks and to inquire about the alleged time discrepancy.  Counsel did not take advantage of this opportunity.

Further, although O'Hara cites this court's decision in *State v. Henderson* (June 9, 2000), Hamilton App. No. C-990657, unreported, as support for his position, he overlooks a very important difference between that case and this.  In *Henderson,* the trial court had concluded and the defendant had been found guilty before defense counsel discovered exculpatory evidence in police files.  Here, the trial was still in progress.  Had defense counsel felt

25

prejudiced by the lack of earlier disclosure, she had the option of requesting a continuance. The fact that she did not defeats a claim of prejudice. As the Ohio Supreme Court held in *State v. Edwards* (1976), . . . 358 N.E.2d 1051, 1059-1060, a defendant cannot claim prejudice on the basis of surprise by the revelation, during trial, of nondisclosed evidence, when the defendant fails to move for a continuance at the time of the objection.

(*Id.,* Ex. F, pp. 7-10).

Under the applicable standard of review set forth in 28 U.S.C. § 2254(d), petitioner is not entitled to relief in this federal habeas corpus proceeding unless the state court's adjudication of his constitutional claim resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d); *see also Williams v. Taylor,* 529 U.S. 362, 402-03 (2000) (O'Connor, J., writing for majority on this issue); *Harris v. Stovall,* 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied,* 522 U.S. 1112 (1998). A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court under § 2254(d)(1) if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams,* 529 U.S. at 405-06 (O'Connor, J.); *Harris,* 212 F.3d at 942.

An "unreasonable application" of Supreme Court precedent occurs (1) if the state court identifies the correct legal standard but unreasonably applies it to the facts of the case, or (2) if the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams,* 529 U.S. at 407-08 (O'Connor, J.). Under § 2254(d)(1)'s "unreasonable application" clause, a federal habeas corpus court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411 (O'Connor, J.); *see also McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000); *Harris,* 212 F.3d at 942. The reasonableness inquiry is an objective one; it does not involve a subjective inquiry into whether or not reasonable jurists would all agree that the state court's application was unreasonable. *Williams,* 529 U.S. at 409-10

(O'Connor, J.); *see also Washington v. Hofbauer,* 228 F.3d 689, 698 (6th Cir. 2000); *Harris,* 212 F.3d at 942-43.  Moreover, the writ may issue only if the application is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee,* 229 F.3d at 510, 512 (citing *Williams,* 529 U.S. at 412).

In this case, the Ohio Court of Appeals correctly identified the Supreme Court's *Brady* decision as governing the resolution of petitioner's constitutional claim.  In *Brady,* the Supreme Court held that the prosecution is required under the Fourteenth Amendment's Due Process Clause to disclose evidence in its possession that is both favorable to the accused and material to guilt or punishment.  *Brady,* 373 U.S. 83, 87 (1963); *see also United States v. Bagley,* 473 U.S. 667, 674 (1985).  *Brady* did not create a broad constitutional right of discovery in a criminal case, but rather is premised on "the avoidance of an unfair trial to the accused," *Brady,* 373 U.S. at 87.  *Bagley,* 473 U.S. at 675 & n.6-7.  Therefore, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."  *Id.* at 675.

To establish a *Brady* violation, it must be shown that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the suppressed evidence was material to guilt or punishment, "irrespective of the good faith or bad faith of the prosecution." *Moore v. Illinois,* 408 U.S. 786, 794-95 (1972); s*ee also Brady,* 373 U.S. at 87; *Bowling v. Parker,* 138 F.Supp.2d 821, 880 (E.D. Ky. 2001), *aff'd,* 344 F.3d 487 (6th Cir. 2003), *cert. denied,* 125 S.Ct. 281 (2004).  Evidence is deemed "material" under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682.  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *Id.*  "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-10 (1976).  This standard for determining materiality focuses on the defendant's guilt or innocence, rather than on the impact of the undisclosed evidence on the defendant's ability to prepare for trial. *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir. 1991) (citing *Agurs,* 427 U.S. at 112 n.20), *cert. denied,* 504 U.S. 930 (1992).

Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. *Bagley,* 473 U.S. at 676.  Impeachment evidence is considered "evidence favorable

27

to the accused" because the jury's assessment of the reliability and truthfulness of a given witness may well be determinative of the defendant's guilt or innocence. *Id.*; *see also Giglio v. United States,* 405 U.S. 150, 153 (1972). On the other hand, evidence that tends to inculpate the defendant or that is neither facially exculpatory nor impeaching does not fall under *Brady*'s proscription. *United States v. Simpson,* 901 F.2d 1223, 1228 (5th Cir. 1990); *United States v. Comosona,* 848 F.2d 1110, 1115 (10th Cir. 1988); *cf. Agurs,* 427 U.S. at 112 n.20; *Phillip,* 948 F.2d at 250.

The *Brady* principles apply only to a complete failure to disclose exculpatory information. *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986), *cert. denied* 480 U.S. 922 (1987); *United States v. Holloway*, 740 F.2d 1373, 1381 (6th Cir.), *cert. denied*, 469 U. S. 1021 (1984). Tardy disclosures of exculpatory evidence do not violate *Brady* unless the defendant has been prejudiced by the delay in disclosure. *Id.* If the disclosure is made "in time for full and adequate correction," no prejudice to the defense occurs. *Holloway*, 740 F.2d at 1381 (quoting *United States v. Enright*, 579 F.2d 980, 989 (6th Cir. 1978)).

*Brady* does not apply to the case-at-hand, which involves at most the tardy disclosure of the victim's prior written statement during trial, made in time for "full and adequate correction" and where no showing has been made of any prejudice to petitioner by the delay in disclosure. As the Ohio Court of Appeals apparently understood, it appears the victim's written statement to Colerain Township police officers was subject to disclosure by the prosecution only under the procedure set forth in Ohio R. Crim. P. 16(B)(1)(g), which provides in relevant part:

> Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.

> If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies.

> If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-

28

examine or comment thereon.

It appears from the record that the procedure set forth in Rule 16(B)(1)(g) was properly followed in this case when it became evident that the victim had given a written statement to the Colerain Township police and defense counsel specifically requested to view that statement to determine if inconsistencies existed between the statement and the victim's trial testimony. (*See* Doc. 5, Vol. V, Tr. 657-70). It further appears that although the trial judge found upon *in camera* review of the victim's prior written statement that there were "absolutely no inconsistencies with her [trial] testimony whatsoever," petitioner's trial counsel was allowed out of "an abundance of caution" to recall the victim to question her about the only "major inconsistency" identified in the statement regarding the time the alleged criminal incident occurred. (*See id.,* Tr. 666-69). Petitioner's counsel chose, however, not to exercise that opportunity even when the victim was later recalled to testify by the State as a rebuttal witness. (*See id.,* Vol. VI, Tr. 944).

Petitioner thus has not shown, as required under *Brady,* that the State improperly withheld the victim's prior written statement from him. Even assuming, *arguendo,* that this statement should have been produced earlier to the defense, petitioner has not demonstrated that "there is a reasonable probability that . . . the result of the [trial] would have been different." *See Bagley,* 473 U.S. at 682. Although the prosecutor at first indicated that he was unaware of any statement by the victim to a state agent, when it later came out at trial that the victim had indeed given a written statement to the Colerain Township police, petitioner's counsel was allowed to view the statement for and to question the victim about any perceived inconsistencies.

It is clear from the record that the only inconsistency cited by defense counsel pertained to the victim's testimony regarding the time of day when the alleged offenses occurred. Assuming, without deciding, that this inconsistency constituted evidence favorable to the defense, as the Ohio Court of Appeals reasonably concluded, it was not "material." The victim's prior statement that the offense occurred at 1:45 p.m. could have fallen within the time-frame given by the victim at trial. In any event, when the "slight" discrepancies between the victim's prior written statement and her trial testimony are viewed in conjunction with the significant inconsistencies contained in the differing versions of events given by petitioner to support his theory that the charges were fabricated, it is not reasonably probable, and indeed is highly unlikely, that the jury would have reached a different conclusion about the credibility to be accorded the victim's testimony.

29

Accordingly, this Court concludes there is no merit to petitioner's claim of a *Brady* violation under the allegations set forth in Ground Two of the petition that are subject to review in this proceeding.

### D.  Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground Five That He Was Denied Effective Assistance By His Trial Counsel

In Ground Five of the petition, petitioner claims that he was denied his Sixth Amendment right to effective assistance of counsel when his trial attorney withdrew the motion to suppress his taped statement and did not object to the trial court's omissions in "fail[ing] to answer the jury's questions and not providing a read-back of requested relevant evidence testimony." (Doc. 1, Brief in Support of Petition, pp. 39-42). This claim was exhausted on direct appeal in the state courts, and is subject to review on the merits.

In rejecting the assignment of error on direct appeal, the Ohio Court of Appeals made findings of fact, which are presumed correct, *see supra* p. 4 n.2, and ruled in relevant part as follows:

> . . . O'Hara argues that he was denied effective assistance of trial counsel. Specifically, he argues that his trial attorney's performance fell below the level of constitutionally required competence, when she (1) withdrew a previously filed motion to suppress, and (2) failed to objected to the trial court's responses to the questions posed by the jury during its deliberations.
>
> In support of the first of these alleged deficiencies, O'Hara merely states that his inculpatory statements to the police were produced by coercion. He does not elaborate further by identifying in what manner the statements were coerced. Presumably this argument is in reference to his claim that the detective who took his statements had promised to drop the kidnapping charge in exchange for his false admission to having engaged in oral sex with Hicks. A tape of the interview, however, does not reveal such a promise. The detective testified that he had not initially charged O'Hara with anything other than rape, because he wanted the grand jury to determine any additional charges.
>
> We cannot say that defense counsel's failure to pursue a motion to suppress based upon the bare allegation that O'Hara's will was overborne by an

unsubstantiated promise of leniency, fell below an objective standard of representation. *Strickland v. Washington* (1984), 466 U.S. 668, 686. . . . In order to conclude that the failure to pursue such a motion was prejudicial, we would have to assume that there was a probability of success in suppressing the statements. We find no basis to make such an assumption, given O'Hara's obvious lack of credibility.

With regard to the second alleged deficiency, our discussion under the third assignment of error suffices to establish that defense counsel did not violate an essential duty owed to her client.

(Doc. 4, Ex. F, pp. 13-14) (state case citation omitted).[4]

Under the applicable standard of review set forth in 28 U.S.C. § 2254(d), *see supra* pp. 26-27, this Court concludes that the Ohio Court of Appeals correctly identified and applied the proper standard of review that was clearly established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984). In order to establish a Sixth Amendment violation under *Strickland*, the petitioner must demonstrate: (1) his attorney made such serious errors he was not functioning as the "counsel" guaranteed by the Sixth Amendment; and (2) his attorney's deficient performance prejudiced the defense by undermining the reliability of the trial result. *See id.* at 687.

Under the first prong of the *Strickland* test, petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *See id.* at 688. Judicial scrutiny of counsel's performance must be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsel's perspective at the time of the conduct. *Id.* at 689. In determining whether or not counsel's performance was deficient, the Court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *See id.*

In order to satisfy the second "prejudice" prong of the *Strickland* test, petitioner must show that a "reasonable probability" exists that, but for his counsel's errors, the result of the trial and appeal proceedings would have been different. *See id.* at 694.

---

[4]The Ohio Court of Appeals' adjudication of the third assignment of error, upon which defense counsel's "second alleged deficiency" is based, is set forth *supra* at pp. 11-12.

Petitioner has met his burden if he shows that the result of his trial would "reasonably likely have been different absent the errors." *See id.* at 695.

The Court need not examine the question of whether counsel's performance was deficient before addressing the question of whether petitioner was prejudiced by counsel's performance. The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner has made an insufficient showing on either ground. *See id*. at 697.

Here, the Ohio Court of Appeals reasonably determined that petitioner had not shown he was denied effective assistance of counsel, because he failed to satisfy the first prong of the *Strickland* test. First, as the state appellate court reasonably found in addressing whether the trial court committed "plain error" in responding to two questions by the jury during deliberations about the substance of certain trial testimony, it is clear from the record that the trial court did not deny the jury's request for testimony and in fact stated that "we can certainly look that up and get that back to you." (*See* Doc. 5, Vol. VI, Tr. 1016, 1017; *see also supra* pp. 11-12; Doc. 4, Ex. F, pp. 10-11). However, because it would "take[] some time" for the court reporter to locate the requested testimony and to ensure that it's "put in a form that she is able to read," the trial court asked the jury to first reconsider its requests in light of the court's responses to all the jury's questions and, if determined that a review of the testimony was still necessary for deliberations to continue, to then submit its requests for testimony in writing to the court. (*See* Doc. 5, Vol. VI, Tr. 1016-18). It did not fall outside the wide range of reasonable professional assistance for petitioner's trial counsel to agree to such a procedure, which in itself did not amount to error and indeed constituted an appropriate response by the trial court to the jury's questions.

Second, it was reasonable for the Court of Appeals to conclude that defense counsel's withdrawal of her motion to suppress petitioner's taped statement to the police did not amount to "deficient" conduct within the meaning of the Sixth Amendment. As the state appellate court found, there is no evidence in the record even remotely suggesting that petitioner's statements to the police were coerced or otherwise involuntarily obtained. On review of the transcript of the challenged interview submitted by petitioner as an exhibit attached to his petition, it appears that before any statement was taken by the police, petitioner was advised of his *Miranda* rights and stated that he understood and waived those rights. (Doc. 1, Ex. 6, pp. 1-2). In the interview, petitioner gave his "side of the story," which was inculpatory only to the extent that it was inconsistent with his later trial testimony. As the Ohio Court of Appeals found, there is

32

no evidence in the record to support any argument that the police promised to drop the kidnapping charge if petitioner admitted to having engaged in oral sex with the victim. In any event, given petitioner's position that he and the victim knew each other and were sexually intimate, the Court gives little credence to any claim that the police coerced a "false" admission from petitioner of having engaged in oral sex with the victim on December 27, 1999.

Accordingly, in sum, this Court concludes that the Ohio Court of Appeals' adjudication of petitioner's ineffective assistance of counsel claim alleged in Ground Five of the petition neither is contrary to nor involves an unreasonable application of the applicable standard of review enunciated by the Supreme Court in *Strickland*. Therefore, petitioner is not entitled to habeas corpus relief based on such claim.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED with prejudice.

2. A certificate of appealability should not issue with respect to the constitutional claims alleged in Grounds Three, Four and Six through Nine of the petition, which this Court has concluded are barred from review on waiver grounds, because under the first prong of the two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would not find it debatable whether this Court is correct in its procedural ruling.[5] A certificate of appealability also should not issue with respect to the remaining claims alleged in Grounds One, Two and Five of the petition, which were addressed on the merits herein, because petitioner has failed to make a substantial showing of the denial of a constitutional right based on these claims. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

---

[5]Because this Court finds that the first prong of the two-part *Slack* standard has not been met in this case, it need not address the second prong of *Slack* as to whether or not "jurists of reason" would find it debatable whether petitioner has stated viable constitutional claims for relief in Grounds Three, Four and Six through Nine of the petition. *See Slack,* 529 U.S. at 484.

3.   With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore DENY petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date:  12/2/2005                        s/Timothy S. Hogan

     cbc                        Timothy S. Hogan
                                     United States Magistrate Judge

J:\BRYANCC\2005 habeas orders\03-52denypet.waiv-sufficevid-bradycl-iac-rapecase.wpd

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

---

Henry O'Hara,
     Petitioner,

                                    Case No. 1:03cv52

         v.                          (Dlott, J.; Hogan, M.J.)

Ernie Moore,
     Respondent.

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Hogan, United States Magistrate Judge, in the above-entitled habeas corpus action. Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof. Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s). Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections. *See* Fed. R. Civ. P. 72(b). A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Henry O'Hara
# 392-404
Lebanon Corr. Inst.
PO Box 56
Lebanon, OH 45036

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by ( *Printed Name* )          C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*          ☐ Yes

2. Article Number
   *(Transfer from service label)*

7001 2510 0008 6348 2702

PS Form 3811, August 2001          Domestic Return Receipt          102595-02-M-1540